# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **TOMMY KELLY GRIFFITH, JR.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 7:19CV00269 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MEDIKO, ET AL.,** ) | By: James P. Jones |
| ) | United States District Judge |
| Defendants. ) | |

*Tommy Kelly Griffith, Jr., Pro Se Plaintiff; Samuel T. Bernier, FRITH ANDERSON + PEAKE PC, Roanoke, Virginia, and Taylor D. Brewer, MORAN REEVES & CONN PC, Richmond, Virginia, for Defendants Mediko, Large, Mullins, DiCocco, and Hurlburt.*

The plaintiff, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 in March of 2019, claiming that the defendants failed to provide him with necessary medical care in jail. Presently before the court are the defendants' Motion to Dismiss and Motions for Summary Judgment. After review of the record, I conclude that the defendants' motions must be granted.

## I. BACKGROUND.

In his verified Complaint, Tommy Kelly Griffith, Jr., the plaintiff, contends that while confined at the Southwest Virginia Regional Jail ("SWVRJ") in Haysi, Virginia, he received inadequate medical care for his high heart rate and his mental health. He alleges the following summary of events on which he bases his claims.

On January 9, 2019, Griffith filed a request for medical care, stating that he felt as if his heart rate or blood pressure was too high and needed to be checked. He was taking the medication propranolol, twice per day, for high heart rate (tachycardia). He received no response that day. Again on February 22, 2019, at around 5:00 p.m., Griffith submitted a request asking for a checkup, stating that he was feeling chest pains and high blood pressure, and was "dizzy headed." Compl. 5, ECF No. 1. The response indicated that Griffith would be seen at sick call, five and a half hours later. At sick call, tests showed that Griffith's vital signs were high, and he was referred to see the doctor. When he saw Dr. Charles Hurlburt on February 26, 2019, all the doctor did was "up them, no proper testing, and no follow up period." *Id.* at 7. Griffith complains that the medical staff checked his heart rate only when he complained and did not take seriously his complaints of chest pains. Even after the increase in his medication dosage, he often felt like his heart rate was high.

On January 31, 2019, Griffith was prescribed Seroquel, an antipsychotic and antidepressant medication. On this medication, Griffith did not sleep well, had crazy thoughts, crying spells, was depressed, and on the edge. *Id.* at 4. On February 3, 2019, Griffith told Qualified Mental Health Professional ("QMHP") April Mullins about the problems he was having on Seroquel. Mullins told Griffith to keep taking the medication until he could see the doctor, stating, "It don't just work overnight."

*Id.* Mental health staff come to the SWVRJ three days per week, and the psychiatrist is available once per week, via video.

On February 6, 2019, Griffith wrote a request form, stating, "If something happen and I have a heart attack and do not bring me back to life. I want to sign a DNR so I can go and be done with all this, [be]cause I will be coming back to a life I no longer want to live thanks a million." *Id.* When a nurse saw his request, Griffith was placed on suicide watch. Griffith wrote a similar request form to Mullins later that day, knowing that mental health staff were to be at the SWVRJ that day. Mullins did not come to see Griffith until February 8, 2019. That day, Griffith signed a paper that allowed him to be released from suicide watch. He still had not seen the psychiatrist about his medication. After his release from suicide watch, Griffith wrote several requests to Mullins, asking to see this doctor.

When Griffith filed his Complaint in March of 2019, he still had not seen the psychiatrist and was still taking Seroquel. Despite the adverse effects he felt he was experiencing from this drug, he was afraid that if he refused the medication, he would receive no mental health treatment. Griffith never complained to the SWVRJ medical staff that he suffered from anxiety. When he reported experiencing chest pains, Nurse Practitioner Crystal Large said, "it could be anxiety." *Id.* at 5.

Griffith's Complaint names as defendants Mediko, Large, Mullins, Dr. Jane DiCocco (the psychiatrist), and Dr. Hurlburt. As relief, he seeks monetary

compensation. Mediko and Large have filed a Motion to Dismiss, and the other defendants have filed Motions for Summary Judgment. Griffith has responded to the defendants' motions, making the motions ripe for disposition.

II. DISCUSSION.

A. Motion to Dismiss by Mediko and Large.

A motion to dismiss tests the legal sufficiency of a complaint. *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-63 (2007). "[T]he complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face."[1] *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). In conducting its review, a court must consider the facts in the light most favorable to the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* Griffith is proceeding pro se and, thus, entitled to a liberal construction of his submissions. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 90-95 (2007).

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). To hold an official liable under § 1983, the

---

[1] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

plaintiff must state facts to affirmatively show that the officer acted personally to deprive the plaintiff of, or violate his, constitutional rights. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

An inmate's Eighth Amendment protections against cruel and unusual punishment include a right to the medical care necessary to address his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

The first part of this legal standard is objective. It requires showing that the inmate's medical condition is "serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*

The second, deliberate indifference part of the standard is subjective. The plaintiff must show that the defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction. *Jackson*, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere

negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable").

Under these standards, Griffith fails to state facts stating any actionable claim that defendant Large deprived him of necessary medical or mental health care. First, the only allegation he makes against Large is that she suggested his chest pains could be related to anxiety. Griffith does not allege that Large, at any time, ignored his medical or mental health complaints, or that she denied him appropriate care. Accordingly, he fails to state any § 1983 claim against Large, and I will grant her Motion to Dismiss.

Similarly, Griffith fails to identify any constitutional violation committed by Mediko. Indeed, the Complaint does not mention this defendant except in the list of defendants in the heading of the case. Even assuming Griffith intends to argue that Mediko employs one or more of the other individual defendants, such an employment relationship alone is not sufficient to impose liability on Mediko for the actions of its employees. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). "Rather, a private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal

rights." *Id.* Griffith does not allege that his dissatisfaction with his medical and mental health care as provided by the other defendants was caused by any Mediko policy. Accordingly, I will grant Mediko's Motion to Dismiss.

### B. The Summary Judgment Motions.

#### 1. *The Defendants' Evidence*.

The other defendants, Dr. Hurlburt, Dr. DiCocco, and Mullins, have filed Motions for Summary Judgment, supported by their affidavits and supporting medical records.[2] QMHP Mullins works for the Virginia Department of Corrections ("VDOC") as an independent contractor to facilitate psychiatric care and treatment of inmates at SWVRJA jail facilities, including the Haysi facility, where Griffith was confined. Mullins is trained to assess and recognize mental disorders, but she is not a physician and cannot formally diagnose. She is also trained to triage inmates' mental health concerns by responding to their requests and grievances. Based on her assessments, she will refer an inmate to the facility psychiatrist.

On December 14, 2018, Griffith requested a visit with the mental health office to discuss his medications. Mullins met with him the same day. Griffith complained that doxepin, the medication he had been taking to treat depression and anxiety, was ineffective and caused drowsiness. He reported daily sadness and a racing mind, but he denied suicidal ideations. He stated that he was stressed over his wife and

---

[2] This summary of the defendants' evidence is undisputed, unless otherwise noted.

children and over "a lot of bad stuff [he had seen] happen in prison." Mem. Supp. Mot. Summ. J. Mullins Aff. ¶ 5, ECF No. 19-1. Mullins placed Griffith on the list to see a psychiatrist for medication management.

Mullins is not a medical doctor and has no authority to write or alter prescriptions. Rather, she acted as the liaison between the inmates and the psychiatrist. Mullins also had no control over the amount of time it took for the psychiatrist to examine a particular patient. Mullins would expedite an appointment request only if the inmate was exhibiting symptoms that were concerning for self harm or harm of others. In Mullins' judgment, Griffith did not exhibit such symptoms when she assessed him.

Dr. DiCocco saw Griffith for the first time on January 31, 2019. Dr. DiCocco diagnosed him with polysubstance dependence and persistent depressive disorder. She discontinued the doxepin and prescribed Seroquel (an antipsychotic medication used to treat schizophrenia and depression). Griffith signed a consent form for the prescription.

On February 2, 2019, Griffith submitted a request to mental health, stating that he wanted to resume taking the doxepin. Mullins responded on February 4, 2019, stating that Griffith needed to allow time for the Seroquel to take effect. Griffith then filed a request asking if the doxepin could be increased. Mullins replied

the next day that the psychiatrist would not increase or change his medications without seeing him.

At 2:34 p.m. on February 6, 2019, Griffith submitted a response, stating that he had told the medical unit that he wanted to sign a Do Not Resuscitate Order ("DNR") because if he had a heart attack and died, he would not "have to live through this anymore." *Id.* Mullins reviewed this response and considered it in context with their ongoing dialogue about his medication. She did not consider his comments to represent a suicide threat. Mullins responded at 3:27 p.m. on February 6, 2019, that Griffith should take the medication that the psychiatrist had prescribed, and that the jail would not let him die.

Shortly thereafter, Griffith filed another request form stating that if he had a heart attack and died, he did not want to be brought back to life. He said that he wanted to sign a DNR, because resuscitating him would return him to a life he "no longer wanted to live." *Id.* at ¶ 9. Because of this message, Griffith was placed on suicide watch. Mullins assessed him on February 8, 2019.[3] He assured her that he was suicidal and had requested the DNR to avoid being kept alive in the event of brain death. Based on this conversation with Griffith and Mullins' education,

---

[3] Mullins states that Griffith was placed on suicide watch on February 8, 2019, and that she assessed him that same day. *See* Mullins Aff. ¶ 9, ECF No. 19-1. The medical records she submits with her affidavit include a report by April Looney, LPN, dated February 7, 2019, about her assessment of Griffith who was then on suicide watch and asking to see mental health because he was not suicidal. *Id.* at Attach. 10-11.

training, and experience, Mullins removed him from suicide watch. This was the last time Griffith mentioned suicide.

Mullins evaluated Griffith in a follow-up visit on February 13, 2019. He reported that the Seroquel was not working and that he preferred the doxepin. He also reported some anxiety, but he denied experiencing panic attacks. Mullins scheduled him for a visit with Dr. DiCocco for medication management.

Dr. DiCocco saw Griffith on March 21, 2019. She discussed with him the side effects he claimed he was having from the Seroquel. It was the doctor's clinical determination that Griffith should discontinue the Seroquel and instead try Lexapro (a different medication used to treat depression and anxiety). The doctor did not discuss Griffith's placement on suicide watch in February. The doctor's review of Griffith's records indicated that Griffith had stated multiple times that he was not suicidal and that he wanted a DNR for reasons unrelated to anxiety and depression. Therefore, the doctor believed that the suicide incident did not merit clinical evaluation on March 21, 2019. When she offered Griffith the opportunity to ask questions at the conclusion of the visit, he did not report anything to her about the suicide watch incident or ask to discuss it. That visit was the last time that Dr. DiCocco interacted with Griffith.

Dr. Hurlburt is a medical doctor who works with the VDOC as an independent contractor to provide care and treatment to inmates at several correctional facilities,

including the SWVJRA facility where Griffith was confined. On February 22, 2019, a nurse assessed Griffith and noted in his report that he felt like his heart was beating out of his chest and he had a lot of anxiety. He requested a visit with a physician, so the nurse placed him on the list to be seen. She also told Griffith to report to the medical department if his symptoms worsened. Although Griffith filed a request to go to the medical department on February 25, 2019, asking for a refill of his Zanaflex prescription for treating muscle spasms, he did not complain further about heart-related symptoms. Large ordered a refill of his Zanaflex prescription that same day.

Dr. Hurlburt saw Griffith on February 26, 2019, when the inmate repeated his concerns about his heart rate and anxiety. He reported that he had been treated in the emergency department ("ED") in 2018 and that providers there had instructed him to follow up with a cardiologist, but he had failed to do so. Dr. Hurlburt's examination of Griffith yielded normal results. Griffith had no symptoms of heart failure or other cardiac issues. His vital signs were all within normal limits. Dr. Hurlburt diagnosed him with intermittent tachycardia, ordered blood work, and instructed staff to obtain Griffith's prior medical records from his visit to the ED. The doctor also increased Griffith's prescription for propranolol (a beta blocker used to treat, among other things, tachycardia). It was Dr. Hurlburt's clinical determination, based upon his education, training, and assessment of Griffith, that

an increase of propranolol would alleviate Griffith's symptoms, and that the blood work would reveal any other issues that needed to be addressed.

The doctor reviewed the results of Griffith's bloodwork on March 5, 2019, and determined that no further action was needed. On March 14, 2019, Griffith complained of sharp pains and a nurse assessed him at sick call. He reported that he was very upset and was having issues with his wife. As he talked to the nurse, his pulse and respiration slowed, and his color returned to normal. Dr. Hurlburt reviewed the nurse's notes from this interaction and ordered an EKG on March 19, 2019.

Dr. Hurlburt later met with Griffith on March 26, 2019. Griffith reported that he "usually felt fine" and that the psychiatrist had recently prescribed Lexapro for his anxiety. His physical exam and his vital signs were normal. The doctor determined that Griffith was not experiencing any acute issues and continued his propranolol. This was the last interaction that Dr. Hurlburt had with Griffith.

2. *The Summary Judgment Standard*.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). In short, a motion for summary judgment should be granted when the proof, taken in the form admissible at trial and resolving all factual doubts in favor of the non-moving party, would lead a reasonable juror to but one conclusion. I must "view the facts and draw reasonable inferences in a light most favorable" to Griffith, as the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

The defendants have filed supporting affidavits and documentation. Accordingly, to avoid summary judgment, Griffith must present sufficient evidence that could carry the burden of proof of his claims at trial. *See id.* He "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248.

A pro se litigant's verified complaint must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion," however. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

### 3. *The Defendants' Motions*.

The defendants' evidence indicates that these medical professionals and others on the SWVRJ medical staff did not ignore Griffith's medical concerns about

his chest pains, irregular heart rate, and mental health medications. On the contrary, a nurse reviewed each request he filed and made a medical judgment about appropriate care and the timing of that care. Nurses assessed his condition, he met with a QMHP and the psychiatrist multiple times about his mental health and adjustment of his medications, and the physician reviewed his symptoms or personally examined him on several occasions, ordering tests and medication adjustments.

Griffith's Complaint is verified and must, therefore, be considered as an affidavit, to the extent that it is based on personal knowledge. The defendants' evidence, however, is based on medical expertise that Griffith does not have. His contentions in the Complaint are based on his feelings about his conditions and what medical care he believed he should receive. His lay opinion that his chest pain or the side effects of his medications warranted immediate medical attention is not sufficient to create a genuine issue of material fact in the face of the defendants' evidence.

Moreover, Griffith's responses to the defendants' summary judgment motions are *not* verified. He vaguely states that the defendants "are making false claims and manufactured fraudulent documents." Traverse 1, ECF Nos. 34 and 35.[4] Griffith does not identify any particular facts in the defendants' affidavits and records that

---

[4] These two documents appear to be identical.

are inaccurate or false. He states that on January 9, 2019, when he reported feeling that his heart rate was too high, he was not taken to the medical unit after submitting numerous requests. He does not connect this incident to any of the defendants, however. He also offers no evidence that his condition that day constituted a serious medical need for different or more immediate medical attention than he received.

Griffith also disputes Mullins' affidavit statement that he was placed on suicide watch on February 8, 2019. He insists that February 6, 2019, was "the day [he] went to suicide watch" and complains that he was not seen by the mental health staff that day. *Id.* at 2. The dispute over when Griffith was placed on suicide watch, however, is not material to Griffith's § 1983 claim against Mullins. It is undisputed that QMHP Mullins reviewed Griffith's first request for a DNR on February 6, 2019, and did not believe it reflected suicidal ideations, based on her prior discussions with him and her training. It is also undisputed that Griffith's other request for a DNR caused him to be placed on suicide watch by order of someone other than the Mullins. Then, when Mullins met with Griffith on February 8, 2019, she assessed his mental state and removed him from suicide watch. Thus, Griffith fails to present evidence that Mullins knew before February 8, 2019, that Griffith was on suicide watch or that she knew of and disregarded, at any time, a serious mental health need that Griffith was suffering. He also fails to allege that he had a serious mental health need for a QMHP assessment before February 8, 2019. Indeed, he and the medical

records indicate that he denied suicidal ideations during this entire period, and nothing in the record suggests how being on suicide watch posed any risk of harm for him.

The only particularized allegation against Dr. Hurlburt is that the doctor failed to take seriously Griffith's complaints of chest pains and heart rate problems and merely increased his medication without proper testing. The medical records contradict this allegation, indicating that Dr. Hurlburt physically assessed Griffith's symptoms and vital signs, ordered blood work, and obtained records from his prior health care providers. The doctor increased the medication dosage based on his medical judgment that this change would better control Griffith's heart rate. When the medication change did not prevent another episode of irregular heart rate, Dr. Hurlburt ordered an EKG. While Griffith may disagree with the doctor's assessments and treatment choices, such disagreements with medical judgments do not support a finding of deliberate indifference. The evidence in the record presents no genuine issue of material fact in dispute on which Griffith could convince a fact finder to hold in his favor on his Eighth Amendment claim against Dr. Hurlburt. Accordingly, I will grant this defendant's Motion for Summary Judgment.

Griffith's other complaint against QMHP Mullins is that she did not expedite his examination by the psychiatrist when he complained about perceived, adverse effects of his new medication. Mullins made the medical judgment not to expedite

Griffith's appointment with the psychiatrist, based on her assessment that he was not a danger to himself or others, and he has not demonstrated otherwise. He also does not contradict Mullins' evidence that she had no control over how soon an inmate would have an examination by the psychiatrist. I find no material disputed fact on which Griffith could prevail in his claims against QMHP Mullins. Accordingly, I will grant her Motion for Summary Judgment.

Similarly, Griffith's only claim against Dr. DiCocco concerns the timing of her appointments with him to review and adjust his mental health medications. This timing is a matter of professional judgment, however, and cannot support a claim of deliberate indifference. Moreover, the evidence is that Dr. DiCocco was responsive to Griffith's complaints and adjusted his medications to address his condition. Finding no material disputed fact on which Griffith could prevail, I will grant Dr. DiCocco's Motion for Summary Judgment.

### III. Conclusion.

For the reasons stated, it is **ORDERED** that the Motion to Dismiss by defendants Large and Mediko, ECF No. 11, is GRANTED; and the Motions for Summary Judgment by defendants QMPH Mullins, Dr. DiCocco, and Dr. Hurlburt, ECF Nos. 18, 20, and 27, are GRANTED.

A separate Judgment will be entered herewith.

                                      ENTER:   February 28, 2020

                                      /s/  James P. Jones
                                      United States District Judge